**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Frank John BONANNO, Defendant-
Appellant.**

**No. 194, Docket 73–1852.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 11, 1973.

Decided Nov. 20, 1973.

use of a tape and a transcript of a telephone conversation between Bonanno and Spiros "Gerry" Dendrinos, a former passer of counterfeit who had become an informer.

## I.

The Government's case consisted of the testimony of two Secret Service agents and of the tape and transcript of the telephone call. Agent Zaino apparently first met Dendrinos on September 6, 1972, a day after the latter was arrested for selling counterfeit money to an undercover agent. After having decided to cooperate with the Government and having evidently identified Bonanno as his source, Dendrinos arranged for Zaino to meet Bonanno. When Dendrinos told Bonanno that Zaino had been the recipient of the counterfeit and Zaino offered Bonanno payment therefor, Bonanno answered, "I do not know what you are talking about." Not convinced by this, Government agents arranged for Dendrinos to make a purchase from Bonanno. On September 7 Dendrinos telephoned Bonanno from the New York City headquarters of the Secret Service. Agent Dotson, who did not testify at the trial, monitored the call which was tape-recorded and later transcribed. The tape and transcript showed that, pursuant to what was apparently a slightly less precise arrangement already existing between them, Bonanno agreed to sell Dendrinos what turned out to be $5020 in counterfeit $20 bills for $1250. He said he would pick up the bills and meet Dendrinos about 1 A.M. near a coffee shop at 43d Street and Sixth Avenue. Thoughtfully, he warned Dendrinos not to carry $1250 in the subway. Dendrinos responded to this solicitude by saying he possibly would be with his partner who had a car, but that he would not let his partner see Bonanno.

The partner, of course, was Agent Zaino. After seeing Bonanno in the coffee shop, he parked the car, allowed Dendrinos to leave, and saw Dendrinos and Bonanno enter a Cadillac. The Cadillac drove away briefly and then came

Gerald L. Shargel, New York City (James M. LaRossa, New York City, of counsel), for defendant-appellant.

Bart M. Schwartz, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty. S. D. N. Y., and Peter L. Truebner and John D. Gordan III, Asst. U. S. Attys., of counsel), for plaintiff-appellee.

Before FRIENDLY, ANDERSON and MULLIGAN, Circuit Judges.

FRIENDLY, Circuit Judge:

Frank John Bonanno appeals from a judgment of the District Court for the Southern District of New York convicting him, on a two-count indictment, of passing, uttering and publishing and of possessing or concealing approximately 250 counterfeit $20 Federal Reserve Notes in violation of 18 U.S.C.A. § 472. The only questions raised concern the

back. A few minutes later Dendrinos returned to Zaino with a bag containing a "stack" of counterfeit $20 bills. Agent Zaino then handed Dendrinos $1250 in genuine bills whose numbers had been recorded. Dendrinos approached Bonanno's car with the money but Bonanno was arrested before this was handed to him. Zaino's testimony was corroborated to some extent by a surveilling agent, Thomas Tully, whose testimony, however, was primarily concerned with efforts to equip Dendrinos with a radio transmitter, whose recorder malfunctioned.

Apparently on the morning of trial, defense counsel for the first time raised objections to the use of the tape recording and transcript of the telephone call. After the jury had been sworn early in the afternoon, the judge directed that the trial proceed so far as possible but agreed to hold an evidentiary hearing the next morning with respect to the tape. At this hearing the Government called Secret Service Agent Marquez, who had been present at headquarters when Agent Dotson arranged for the call from Dendrinos to Bonanno. He testified that, after having obtained Dendrinos' agreement to having the call taped, Agent Dotson instructed a special agent to set up the apparatus. This included installing a connection of a tape recorder with the telephone receiver and an earpiece to monitor the conversation. After all this had been done, Dendrinos was brought into the room and Dotson placed identifying information on the tape recorder. Having observed the tape recorder and its installation, Dendrinos then made the call, with Dotson monitoring it. At the conclusion of Marquez' testimony the judge found it credible and overruled a defense objection based on lack of consent by Dendrinos.

Defense counsel protested that the judge had ruled without affording him an opportunity to call Dendrinos, who was present, under a Government subpoena, as a prospective witness at the trial. When called by the defense, Dendrinos promptly claimed the privilege against self-incrimination with respect to practically all questions and specifically those concerning the telephone call and his consent to its being monitored and recorded. The judge declined to order him to testify but suggested that he confer with the lawyer who had represented him when he pleaded guilty to a counterfeiting charge in the Eastern District of New York. Meanwhile the trial was resumed.

A robing room conference was held after the lunch recess. The lawyer reported that he had unsuccessfully urged Dendrinos to testify and thought the latter's unwillingness was due as much to fear of physical violence as to worry about self-incrimination. On return to the courtroom, which had been cleared of spectators, the judge further interrogated Dendrinos. The latter first repeated that to tell what he had said to the Secret Service agents might involve him in a crime, only to say the opposite a moment later and then to revert to his original version. After the prosecutor had offered to investigate whether immunity could be granted, the judge, on the basis of observing the witness' appearance, asked whether he had taken drugs recently and found that he had taken methadone that morning. The judge thereupon asked counsel for both sides to consider whether, apart from the question of privilege, any testimony by Dendrinos should be received. After a short recess, both sides agreed in an off-the-record conference in the robing room that they would not call him back to the stand. The judge thereupon repeated his ruling that the Government had shown consent.

Agent Zaino then resumed his testimony. He identified two of the three voices on the tape as those of Dendrinos and of Bonanno, whom he had heard in person at the meeting Dendrinos had arranged. The court ruled that this identification was sufficient so far as concerned the conversation between Dendrinos and Bonanno and allowed it and the

corresponding transcript to be received in evidence.

## II.

Bonanno's broadest attack is that a warrantless recording of a telephone conversation violates the Fourth Amendment rights of a non-consenting party even though the other has consented. He argues that United States v. San Martin, 469 F.2d 5, 7 (2 Cir. 1972), cert. denied, 410 U.S. 934, 93 S.Ct. 1388, 35 L.Ed.2d 598 (1973), indicated that this question was open in this circuit and evidenced some sympathy with his contention by its approving quotation from Judge Learned Hand's opinion in United States v. Polakoff, 112 F.2d 888, 889 (2 Cir.), cert. denied, 311 U.S. 653, 61 S.Ct. 41, 85 L. Ed. 418 (1940), as to the antiphonal nature of a telephone conversation and the consequent need of consent by both parties. But Judge Hand's opinion, which dealt with § 605 of the Federal Communications Act, 47 U.S.C. § 605, which at that time was the sole basis for protecting the privacy of telephone conversations in the absence of trespass, was rejected by the Supreme Court with respect to police officers listening in on a regularly used telephone extension in Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957), and in light of that decision, by this court with respect to recording devices in United States v. Ballou, 348 F.2d 467 (2 Cir. 1965), and United States v. Mc-Guire, 381 F.2d 306, 314–315 (2 Cir. 1967), cert. denied, 389 U.S. 1053, 88 S.

Ct. 800, 19 L.Ed.2d 848 (1968). Cf. United States v. Jackson, 390 F.2d 317, 318–319 (2 Cir.), cert. denied, 392 U.S. 935, 88 S.Ct. 2304, 20 L.Ed.2d 1394 (1968).

Bonanno claims all this has been altered by Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), which extended Fourth Amendment protection to voice communications. We squarely held the contrary in United States v. Kaufer, 406 F. 2d 550, 552 (2 Cir.), *summarily affirmed on the ground of the non-retroactivity of Katz*, 394 U.S. 458, 89 S.Ct. 1223, 22 L.Ed.2d 414 (1969), with respect to listening in on a telephone conversation with the consent of one party. And United States v. Jackson, supra, which was also decided after *Katz* and before the Supreme Court had ruled that *Katz* was not retroactive, seems to have held the same with respect to the recording of a telephone conversation with the consent of one party.

There have been only two relevant subsequent developments. One is the decision in United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), which affirmed the continued vitality of On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952), and Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), upholding the use of recording and transmitting devices on the person, in the face of a Fourth Amendment claim based on *Katz*.[1] The other is enactment of Title III of the Omnibus Crime Control and Safe Streets Act of

---

[1]. This reversed the holding of the Seventh Circuit, 405 F.2d 838 (1969) (*en banc*), with which we expressed disagreement in *Kaufer*. Mr. Justice White cited the latter opinion with apparent approval, 401 U.S. at 750–751 n. 4.

Appellant cites Bakes v. United States, 350 F.Supp. 547, 549–550 (N.D.Ill.1972), for the proposition that *White*'s binding effect is limited by its having produced a "4–4 split" on the major issue, with a fifth vote, that of Justice Brennan, having been attracted to the majority only on the narrow ground that *Katz* lacked retroactive effect. This argu-

ment misses the point that Justice Brennan was the sixth and not the fifth vote in the *White* majority. Justice Black concurred with the four-man plurality not on a narrow ground like that of Justice Brennan, but rather on the extremely broad one that eavesdropping by electronic means does not constitute a "search" or "seizure" within the meaning of the Fourth Amendment. *White* is therefore authoritative on the constitutional validity of recording and transmitting devices on the person, although not on the grounds for this. See Holmes v. Burr, 486 F.2d 55 (9 Cir. 1973).

1968, 82 Stat. 211, which, in providing for interception of wire communications pursuant to warrant, expressly excepted from the warrant requirement a case where "one of the parties to the communication has given prior consent to such interception," 18 U.S.C. § 2511(2)(c)—a statute referred to with seeming approval in United States v. White, *supra*, 401 U.S. at 753, 91 S.Ct. 1122. These developments strengthen our previous decisions. See, *accord*, United States v. Puchi, 441 F.2d 697 (9 Cir.), cert. denied, 404 U.S. 853, 92 S.Ct. 92, 30 L.Ed. 2d 92 (1971); Holmes v. Burr, 486 F.2d 55 (Cir. 1973).

■ Moreover, if this circuit had not previously considered the issue, we should still reject appellant's constitutional argument under the controlling Supreme Court decisions. Despite the dissent in Holmes v. Burr, *supra*, we consider the considerations set forth in United States v. White, *supra*, 401 U.S. at 751–53, 91 S.Ct. 1122, to be persuasive that although a person having a telephone conversation with another in regard to criminal activities generally does not expect that the latter will reveal this to the police, he has no "justifiable" expectation, see Katz v. United States, *supra*, 389 U.S. at 353, 88 S.Ct. 507, that the latter may not do so or may not have consented to a government agent's listening in or making a recording. See 401 U.S. at 751–752, 91 S.Ct. 1122. There is no more reason to distinguish between the two latter cases under the Fourth Amendment than there was under § 605 of the Communications Act. The guarantee of privacy recognized in *Katz* was against governmental interception not reasonably expectable by either party, not against governmental listening or recording with the consent of the other party. We therefore regard the doubts voiced in United States v. San Martin, *supra*, 469 F.2d at 7, as limited to the peculiar facts of that case where the consent to

the placing of the bug was given by a person other than the one who conducted the incriminating conversation—a situation concerning which we express no opinion.

## III.

Bonanno also challenges the ruling of the district court that Dendrinos consented to the monitoring and recording of the telephone conversation. The challenge is two-pronged. Bonanno relies on the judge's apparent belief that Dendrinos was incompetent to testify at the trial and argues that the Government's proof was deficient because of its failure to call Agent Dotson, who had obtained the consent.[2]

■ We observe at the outset that the extent of proof required to show that an informer consented to the monitoring or recording of a telephone call is normally quite different from that needed to show consent to a physical search, whether by the defendant himself or by some person in a position to give an effective one. Cf., *e. g.*, United States v. Viale, 312 F.2d 595, 601 (2 Cir.), cert. denied, 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 199 (1963); United States v. Como, 340 F.2d 891, 893 (2 Cir. 1965); United States ex rel. Lundergan v. McMann, 417 F.2d 519, 521–522 (2 Cir. 1969). See generally Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In cases involving physical search, the person alleged to have consented is doing something apparently contrary to his own interests or to those of another who often is in some way connected with him. An informer's consent to the monitoring or recording of a telephone conversation is an incident to a course of cooperation with law enforcement officials on which he has ordinarily decided some time previously and entails no unpleasant consequences to him. Hence, it will normally suffice for the Government to show that the informer went ahead with a call after

---

2. Another claim, that Agent Marquez' testimony was inadmissible hearsay, does not merit discussion.

knowing what the law enforcement officers were about.

■ There is nothing to impeach the judge's ruling under this easy test—or, for that matter, under a more stringent one. Dendrinos had earlier shown his desire to cooperate by arranging a meeting with Bonanno; there was no reason for him to alter course when the agents asked him to take the next step. After agreeing and seeing the physical arrangements, he proceeded to conduct an intelligent conversation with the defendant. His taking a dose of methadone six months later, which, in the judge's view, made him of dubious competence as a trial witness, has no tendency to show he was in a similar condition on the night of the telephone call.

■ While it would have been preferable for the Government to have called Agent Dotson rather than Agent Marquez to testify to Dendrinos' consent, there is no rule requiring the production of the best witness. Moreover, the Government's failure was excusable. Until the morning of the trial it had no notice that an issue would be raised in regard to the admissibility of the tapes, and it expected to call Dendrinos to testify and to identify them. There was thus no apparent need for the presence of Agent Dotson, who had been allowed to go to Mexico for the protection of John F. Kennedy, Jr.

Bonanno's remaining contentions concern the adequacy of the identification of the tapes and their use as independent evidence rather than for corroboration.

■ On the first contention Bonanno stresses that the identification was not made by Agent Dotson or by Dendrinos but, for reasons already stated, by Agent Zaino, who had not listened to the telephone call at the time it was made. To the extent that this argument is directed at the adequacy of the evidentiary foundation in terms of date, time, place of recording and so on, the Government rightly complains that timely objection was not raised below. And the argument that Agent Zaino was incompetent solely because he was not a contemporaneous witness to the phone conversation is without merit. Analogy may be drawn to the well-settled rule that "Identification of a voice, whether heard firsthand or through mechancial or electronic transmission or recording," may be made "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." Proposed Federal Rules of Evidence 901(b)(5). See McCormick, Evidence (Cleary ed. 1972) § 226, at 554 & n.81 and cases there cited. Furthermore, in view of the identity between the scenario arranged on the telephone and that subsequently enacted, the case would come within the principle of Van Riper v. United States, 13 F.2d 961, 968 (2 Cir.), cert. denied, 273 U.S. 702, 47 S.Ct. 102, 71 L.Ed. 848 (1926), that in some instances "the substance of the communication may itself be enough to make prima facie proof."

■ While the contention that a tape recording may be used only for corroboration derives some support from the concurring opinion of Chief Justice Warren in Lopez v. United States, *supra*, 373 U.S. at 441, 83 S.Ct. 1381, his vote was not needed for a majority and the Court's opinion does not thus limit admissibility. Although Mr. Justice Harlan referred on one occasion to "corroborating evidence," *id.* at 439, 83 S.Ct. at 1388, he concluded his constitutional discussion on the note that the defendant took the risk that his offer of a bribe "would be accurately reproduced in court, whether by faultless memory or mechanical recording." *Id.* Only in discussing potential ·exercise of the Court's supervisory powers did Justice Harlan leave open even the possibility that use of recordings could sometimes be limited to purposes of corroboration. *Id.* at 440 n.12, 83 S.Ct. 1381. And in United States v. White, *supra*, 401 U.S. at 753, 91 S.Ct. 1122, while leaving Justice Harlan's *Lopez* opinion intact, *id.* at 749 n.3, 751, 752, 91 S.Ct. at 1126, Mr. Justice White remarked that "An electronic recording will many times produce a

more reliable rendition of what a defendant has said than will the unaided memory of a police agent." While a trial judge may encounter problems when a tape is of poor audibility, cf., *e. g.*, United States v. Enten, 329 F.Supp. 307 (D.D.C.1971), or its trustworthiness is challenged, and may decide in such cases to allow a tape to be used only for corroboration, or not to allow its use at all, no such problems were presented here. Under such circumstances, the court properly allowed the tape and the transcript to be received as independent evidence.

Affirmed.